**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| David Billups, | Case No. C-1-01-377 |
|    Plaintiff | |
| vs | |
| James McWeeney, et al., | **REPORT AND RECOMMENDATION** |
|    Defendants | (Spiegel, J.; Hogan, M.J.) |

     Plaintiff is a former inmate at the Southern Ohio Correctional Facility (SOCF). He brings this civil rights action under 42 U.S.C. § 1983 alleging a violation of his constitutional rights. The remaining defendant in this action is Dr. Pedro Obregon, the SOCF Medical Director. Plaintiff alleges that Dr. Obregon was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United States Constitution. This matter is before the Court on Dr. Obregon's motion for summary judgment (Doc. 123), plaintiff's memorandum in opposition (Doc. 128), defendant Obregon's reply memorandum (Doc. 130), and plaintiff's "traverse in opposition to defendant's reply." (Doc. 136).

     A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party must demonstrate the absence of genuine disputes over facts which, under the substantive law governing the issue, could affect the outcome of the action. *Celotex Corp.*, 477 U.S. at 323.

     In response to a properly supported summary judgment motion, the non-moving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987); *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989). The trial judge's function is not to weigh the evidence

and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249-50. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

Plaintiff has a history of mercury poisoning dating back to 1995 and has been treated with chelation therapy for this condition. (Doc. 12, Verified Statement of Facts by plaintiff, ¶¶1-2; Doc. 109, Exhs. A and B).[1] Plaintiff states he was given a "permanent" doctor's order not to smoke or be exposed to second hand smoke on January 27, 1999. (Doc. 12, Declaration, ¶3). In support of this assertion, plaintiff submits a copy of a "Medical Restriction Statement" dated January 27, 1999, from the Ross Correctional Institution (RCI) Inmate Health Services. The restriction specifies a "smoke free unit" with a "start" date of January 27, 1999 and a "stop" date of "indef." (Doc. 12, Exh. AA).

Dr. Marcel Casavant, a specialist in medical toxicology, treated plaintiff for several years both at Children's Hospital in Columbus, Ohio and at the Corrections Medical Center. (Doc. 100, Exh. I, Casavant Aff. ¶¶2-5). Dr. Casavant last saw plaintiff on July 13, 1999, at which time he noted he was pleased with the results of plaintiff's recent blood and urine studies for mercury. (Doc. 100, Exh. I, Casavant Aff. ¶¶6-7). In September 1999, Dr. Casavant referred plaintiff to a neuropsychologist for an assessment. The assessment showed he was functioning in the normal range and showed no evidence of cerebral dysfunction or residual effects of mercury toxicity. (Doc. 100, Exh. I, Casavant Aff. ¶8). In December 1999, Dr. Casavant received a letter from plaintiff terminating Dr. Casavant as his doctor and requesting his medical records. (Doc. 100, Exh. I, Casavant Aff. ¶9). Dr. Casavant, by letter of December 28, 1999, expressed his disappointment and advised plaintiff that if he changed his mind he was welcome to return as a patient. (Doc. 100, Exh. I, Casavant Aff. ¶10). Dr. Casavant avers that "[b]ased on the last time I saw him, he was stable and appeared to be in no distress as a result of the mercury poisoning." (Doc. 100, Exh. I, Casavant Aff. ¶13). Dr. Casavant states, "Although exposure to second hand smoke is a danger to anyone, I am not aware that it is more of an issue for people with mercury

---

[1] In the interest of judicial efficiency, the undersigned shall incorporate the relevant facts set forth in the previous Report and Recommendations of September 11, 2002 and July 28, 2003, and supplement the instant Report with the additional evidence set forth by the parties.

poisoning." (Doc. 100, Exh. I, Casavant Aff. ¶14).

Plaintiff was transferred to the Lebanon Correctional Institution (LeCI) on September 17, 1999. (Doc. 38, Exh. F). On September 28, 1999, Dr. James McWeeney, the Medical Director at LeCI, reviewed plaintiff's medical chart and, while noting plaintiff's history of mercury poisoning and diabetes, along with several other conditions, determined plaintiff did not require a medical restriction to be placed in a nonsmoking cell. (Doc. 100, Exh. P, McWeeney Aff. ¶¶7-9).

On October 26, 1999, LeCI Dr. Dulan, a doctor who worked as Dr. McWeeney's assistant at LeCI and who was supervised by McWeeney, issued an order that plaintiff be placed in a "non-smoking pod." (Doc. 12, Declaration, ¶4; Doc. 12, Exh. BB; Doc. 38, Exhs. A, D ¶11; Doc. 100, Exh. P, McWeeney Aff. ¶¶10-12). Dr. Dulan also placed plaintiff on a Succimer protocol, a form of chelation therapy, to remove some of the mercury from his body. This protocol was to be used every other month. (Doc. 123, Exh. G). Dr. McWeeney states that Dr. Dulan's order for a non-smoking pod was issued without his consultation or knowledge. (Doc. 100, Exh. P, McWeeney Aff. ¶12).

A memorandum dated November 15, 1999 from the LeCI medical department states that plaintiff is restricted to a non-smoking block due to an unspecified "medical condition." (Doc. 38, Exh. B). Dr. Dulan's name appears as the "medical authority" on this memorandum. *Id*.

On December 30, 1999, Dr. McWeeney cancelled the non-smoking area order. (Doc. 38, Exh. C). Dr. McWeeney avers that he did not learn of the medical order issued by Dr. Dulan until plaintiff filed a grievance. (Doc. 100, Exh. P, McWeeney Aff. ¶13). Dr. McWeeney felt it was not medically necessary for plaintiff to be placed at the head of the waiting list to be moved to a nonsmoking cellblock. In making this determination, Dr. McWeeney reviewed plaintiff's medical chart which showed some "stable" lung damage, but no symptoms of a pulmonary condition that would cause injury by ambient smoke. (Doc. 100, Exh. P, McWeeney Aff. ¶¶16-17). The chart also showed plaintiff was not taking any medications, not using any systemic steroids, and not suffering from any breathing disorder. (Doc. 100, Exh. P, McWeeney Aff. ¶18). Dr. McWeeney states he also reviewed a copy of a letter sent to plaintiff's toxicologist, Dr. Marcel Casavant, from a consulting neuropsychologist. (Doc. 100, Exh. P, McWeeney Aff. ¶15 and Doc. 106, Exh. C). The neuropsychological exam revealed plaintiff was functioning within the normal range. The exam also showed

no evidence of cerebral dysfunction or residual effects of mercury toxicity. *Id.* Dr. McWeeney avers, "Because we had other inmates who had a greater medical need, it was my professional opinion that Mr. Billups could wait his turn until a nonsmoking cell became available." (Doc. 100, Exh. P, McWeeney Aff. ¶19).

Plaintiff was transferred to SOCF on April 24, 2001. He was examined by Dr. Pedro Obregon, the SOCF Medical Director, on May 4, 2001. (Doc. 14, Doc. 123, Exh. M). Plaintiff states he showed Dr. Obregon copies of his "permanent medical restrictions" relating to the mercury poisoning which restricted plaintiff from working around heat, steam, or heat sources, and which required him to be housed in a non-smoking living area. (Doc. 14 at 1). Plaintiff alleges that Dr. Obregon refused to re-issue or acknowledge these orders at SOCF. (Doc. 14 at 1).

Dr. Obregon avers that as the medical director of SOCF, he is responsible for establishing his own course of treatment for an individual patient and for issuing those restrictions which he believes is indicated pursuant to Ohio Department of Rehabilitation and Correction policy. (Doc. 123, Exh. K; see also Doc. 38, Exh. D). The affidavit of Dr. Bruce Martin, the Director of Medical Services of the Ohio Department of Rehabilitation and Correction, confirms that each Institutional Medical Director, such as Dr. Obregon, "has the authority to exercise his own clinical judgment" and that there is no such thing as a "standing permanent order." (Doc. 38, Exh. D ¶¶7, 9-10). Dr. Obregon questioned whether plaintiff needed the restrictions he was requesting and therefore consulted Dr. Martin, his supervisor. On May 17, 2001, Dr. Martin advised Dr. Obregon that based on his last report, plaintiff's mercury level was normal and therefore he needed no restrictions. (Doc. 123, Exh. K). Dr. Martin advised Dr. Obregon to monitor plaintiff's blood levels on a routine basis to ascertain whether there was any increase in his mercury level, and to treat only if there was an increase. *Id.* Dr. Obregon states there was no medical necessity for plaintiff to be housed in a nonsmoking cell, one of the restrictions plaintiff requested. Dr. Obregon also states that at that time SOCF had not yet designated a nonsmoking cellblock for general population inmates and therefore he could not issue such an order. *Id.*

Dr. Obregon referred plaintiff to the Toxicology Department of Children's Hospital to be seen by Dr. Casavant. Dr. Obregon states that on May 17, 2001, plaintiff refused to go to Children's Hospital and refused to sign the appropriate form, which Dr. Obregon noted in plaintiff's chart. (Doc. 123, Exhs. K and M). On June 1, 2001, Dr. Obregon noted that plaintiff's mercury blood level was within normal limits

and discontinued the Succimer therapy. (Doc. 123, Exh. M). On July 23, 2001, plaintiff refused to go out of his cell to have blood drawn to test his mercury levels. (Doc. 123, Exh. M).

Plaintiff disputes he "refused" to go to Children's Hospital on May 17, 2001, and states he requested the trip be rescheduled because of an attorney phone conference. (Doc. 128, Exh. A). Plaintiff, without evidence, disputes that use of "blood mercury levels" is the correct method for ascertaining the amount of mercury poisoning in his body. (Doc. 128 at 2). He alleges defendant Obregon was deliberately indifferent to is serious medical needs when he denied plaintiff smoke-free housing and discontinued the chelation therapy. *Id*.

**Defendant Obregon's Motion for Summary Judgment Should be Granted.**

After incarceration, only the "unnecessary and wanton" infliction of pain constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991), quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Unnecessary and wanton infliction of pain includes those conditions that are "totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981), quoting *Gregg v. Georgia*, 428 U.S. 153, 183 (1976). A prisoner may state a cause of action under the Eighth Amendment for involuntary exposure to second hand smoke which results in a present injury or an unreasonable risk of serious damage to his future health. *Helling v. McKinney*, 509 U.S. 25, 35-36 (1993). To establish his Eighth Amendment claim regarding exposure to environmental tobacco smoke, plaintiff must prove the existence of both an objective and subjective component. *Id. See also Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson,* 501 U.S. at 297-300.

The objective component requires that the deprivation alleged be "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 834, quoting *Wilson*, 501 U.S. at 298. To establish the objective component of his Eighth Amendment claim, plaintiff must prove that: (1) "he himself is being exposed to unreasonably high levels of" environmental tobacco smoke (ETS); (2) there was more than a statistical probability that he would be injured by ETS; and (3) involuntary exposure to ETS violates contemporary standards of decency. *Helling v. McKinney*, 509 U.S. 25, 35-36 (1993). Plaintiff may also establish the objective component of his Eighth Amendment claim by proving that his pre-existing medical conditions were such that exposing him to

ETS represents a serious health threat, not merely a discomfort. *Hunt v. Reynolds*, 974 F.2d 734, 735 (6th Cir. 1992), *cert. denied*, 510 U.S. 1052 (1994).

Under the subjective component, plaintiff must establish that defendant Obregon acted with deliberate indifference to his serious medical needs. *Estelle*, 429 U.S. at 106. *See also Farmer*, 511 U.S. at 834; *Wilson*, 501 U.S. at 302-303. Plaintiff must present evidence that defendant Obregon's conduct amounted to deliberate indifference to a known risk of harm to plaintiff. *Farmer,* 511 U.S. at 837, 842. A prison official may be held liable for denying an inmate humane conditions of confinement only if he knows that an inmate faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Prison officials must exhibit more than lack of due care for a prisoner's health or safety before an Eighth Amendment violation will be found. *Id.* at 835. *See also Whitley*, 475 U.S. at 319. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. It is not enough that the official "should" have perceived a significant risk, but did not. *Id.* Moreover, liability will not be found where a prison official actually knew of a substantial risk of harm to an inmate if he responded reasonably to the risk, even if the harm ultimately was not averted. *Farmer,* 511 U.S. at 844.

With respect to the objective component, it is incumbent upon plaintiff to present evidence establishing he has a serious medical need for a smoke-free environment, *see Hunt*, 974 F.2d at 735, or that, regardless of health, the level of ETS in the prison creates an unreasonable risk of serious damage to his future health. *See Helling*, 509 U.S. at 35. Here, plaintiff presents evidence that he has a history of and treatment for mercury poisoning. The evidence shows that on three occasions physicians have ordered that plaintiff be placed in a non-smoking cell block or pod because of his medical condition. (Doc. 12, Exh. AA, Exh. BB; Doc. 38, Exh. A, Exh. B; Doc. 100, Exh. P, McWeeney Aff. ¶¶10-12). Plaintiff characterizes the first of these orders from the Ross Correctional Institution as "permanent," given the "indefinite" stop date on the order. Defendants present evidence that there is no such thing as a "standing permanent order." (Doc. 38, Exh. D ¶¶9-10).

The crucial issue in this matter, however, is whether plaintiff suffered from a medical condition requiring a smoke-free environment at the time Dr. Obregon declined to issue the medical restrictions requested by plaintiff and discontinued the Succimer therapy. *Hunt*, 974 F.2d at 735. As this Court acknowledged in its rulings

on the previous motions for summary judgment, the three previous medical orders issued at RCI and LeCI respectively are some evidence that exposure to ETS may present a serious health risk to plaintiff, and not merely a discomfort.  However, as also noted, Dr. Obregon, as medical director of SOCF, was not bound by previous medical orders written by physicians at other institutions when he evaluated plaintiff's medical condition in May 2001.  The evidence from plaintiff's treating toxicologist, Dr. Casavant, shows plaintiff's condition was stable and his intellectual functioning was normal. (Doc. 100, Exh. I, Casavant Aff. ¶8).  In addition, the evidence shows no residual effects of mercury toxicity. (Doc. 100, Exh. I, Casavant Aff. ¶8).  At the time plaintiff was transferred to SOCF, his blood mercury levels were found to be within normal limits and, based on his evaluation of plaintiff's medical history and physical examination, Dr. Obregon found no medical necessity for a non-smoking cellblock placement or continuation of chelation therapy.  Most importantly, the undisputed evidence shows that exposure to second hand smoke poses no greater threat to a person with mercury poisoning than to any other individual.  Dr. Casavant states, "Although exposure to second hand smoke is a danger to anyone, I am not aware that it is more of an issue for people with mercury poisoning." (Doc. 100, Exh. I, Casavant Aff. ¶14).  Dr. Casavant, who is a specialist in toxicology, is in the best position to assess the necessity of a smoke-free environment for individuals suffering from mercury poisoning.  In view of this evidence, and in the absence of any other contemporaneous evidence showing plaintiff had some other medical condition necessitating a smoke-free environment at the time Dr. Obregon declined to issue orders for a smoke-free environment and to discontinue chelation therapy, there are no genuine issues of fact as to whether plaintiff had a serious medical need for a smoke-free environment or chelation therapy.  Therefore, plaintiff fails to establish the objective component of his Eighth Amendment claim against Dr. Obregon.

In terms of the subjective component of plaintiff's Eighth Amendment claim, plaintiff must show Dr. Obregon knew plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 847.  Here, the undisputed evidence shows Dr. Obregon examined plaintiff, evaluated his medical history, and, in consultation with his supervisor Dr. Martin, assessed no need for the restrictions or treatment sought by plaintiff.  Furthermore, Dr. Obregon referred plaintiff for a consultation visit to the Toxicology Department of Children's Hospital to be seen by Dr. Casavant to monitor plaintiff's condition and blood levels.  While plaintiff disputes he "refused" to keep this medical appointment, this dispute is not material to whether or not Dr. Obregon was deliberately indifferent to plaintiff's medical condition.  The salient facts are Dr.

Obregon's referral and monitoring of plaintiff's blood levels in an effort to ascertain whether there was an increase in his mercury level. The medical records show plaintiff was repeatedly evaluated and treated by Dr. Obregon and other clinicians with regard to his numerous medical conditions, including the mercury poisoning. Although plaintiff disagrees with the type of the treatment he ultimately received, the Court cannot say that such treatment was so "woefully inadequate as to amount to no treatment at all." *Westlake*, 537 F.2d at 860-61 n.5. Therefore, plaintiff fails to establish the subjective component of his Eighth Amendment claim against defendant Obregon.

**IT IS THEREFORE RECOMMENDED THAT** defendant Obregon's motion for summary judgment on plaintiff's Eighth Amendment deliberate indifference claim be granted.


Date: 2/12/2004                                         s/Timothy S. Hogan
                                                        Timothy S. Hogan
                                                        United States Magistrate Judge

**NOTICE TO THE PARTIES REGARDING THE FILING OF
OBJECTIONS TO THIS R&R**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **TEN (10) DAYS** after being served with a copy thereof.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **TEN DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).